UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| FRANK JUDSON, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 06-124-B-W |
| | ) | |
| MOUNT DESERT POLICE, *et al.*, | ) | |
| | ) | |
| Defendant. | ) | |

### *AMENDED*[*] RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Dr. Frank Judson filed this civil rights action against two Mount Desert police officers and their department and chief in connection with an arrest on charges of operating under the influence. Dr. Judson's complaint includes claims of unlawful arrest, excessive force, failure to train, a civil rights conspiracy claim, analogous Maine civil rights claims and various state law tort claims. The defendants' motion for summary judgment on all counts is now pending. I recommend that the Court grant the motion.

#### SUMMARY JUDGMENT FACTS

The following statement of facts is drawn from the parties' Local Rule 56 statements of material fact in accordance with this District's summary judgment practice. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the procedure); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). When a statement offered by a party is uncontested and is supported by a citation to record material having evidentiary quality, the statement has been set forth herein

---

[*] The only amendment is that on Page 9, Officer "Kerr" is corrected to be Officer "Keller".

essentially as offered. When a statement of fact is contested and the evidentiary record is capable of supporting alternative findings of fact, the statement in dispute has been characterized for purposes of summary judgment in the manner that favors the non-movant. Merch. Ins. Co. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).

On the evening in question Defendant James Willis was the Chief of Police of the Mount Desert Police Department and Defendants John Wardwell and Mark Keller were Maine-certified patrol officers employed and field-trained by the Department. (Statement of Material Fact ("SMF") ¶¶ 1-10, Doc. No. 12.) As part of their field training, and as part of their prior education at the Maine Criminal Justice Academy, both Wardwell and Keller were trained in regard to the enforcement of Maine motor vehicle law, including the detection of drivers impaired by alcohol or drugs, and the appropriate means by which to exercise their arrest powers. This training included instruction in the National Highway Traffic & Safety Administration's (NHTSA) standard field sobriety tests. (Id. ¶¶ 13-14.) They were also certified operators of the Intoxilyzer 5000, which is used to perform breath tests on drivers who are suspected to be under the influence of alcohol. (Id. ¶ 65.)

On October 20, 2005, at approximately 10:00 p.m., Officer Wardwell, accompanied by Officer Keller, stopped a vehicle in Somesville, after radar indicated it was traveling 39 miles per hour in a 25 mile per hour zone. (Id. ¶¶ 21-22.) Officer Wardwell maintains that he smelled a strong odor of intoxicating liquor coming from the vehicle. (Id. ¶ 23.) Doctor Judson responds that *he* did not smell strongly of liquor, which does not controvert Officer Wardwell's statement (there were four individuals in the car and Judson avers that he only consumed two glasses of

2

wine). (Opposing Statement of Material Facts ("OSMF") ¶ 23, Doc. No. 16.)[1] Because Dr. Judson was driving the vehicle, Officer Wardwell spoke with him concerning the traffic stop. (SMF ¶ 26.) When asked where he was coming from, Dr. Judson responded, "Denver." (Id. ¶ 27.) In fact, Dr. Judson had flown from Denver earlier in the day. (OSMF ¶ 27.) Evidently realizing that Officer Wardwell was not asking about Dr. Judson's travels earlier in the day, the front seat passenger corrected him by telling Officer Wardwell that they had just come from dinner in Bar Harbor. (SMF ¶ 27.) Asked if he had been drinking that evening, Dr. Judson responded that he had, informing Wardwell that he had two glasses of wine. (Id. ¶ 29.) The parties agree that Dr. Judson shared a bottle of wine with his wife and consumed roughly ten ounces of wine. (Id. ¶ 28.)[2]

Officer Wardwell asked Dr. Judson to exit the vehicle to undergo field sobriety testing. (Id. ¶ 30.) The defendants offer statements to the effect that Dr. Judson was unsteady on his feet, but Dr. Judson responds with denials that are supported by his affidavit. (Id. ¶¶ 31, 33; OSMF ¶¶ 31, 33.) Officer Wardwell had Dr. Judson undergo two of the NHTSA's standard field sobriety tests, the horizontal gaze nystagmus (HGN) and the walk-and-turn test. (SMF ¶ 34.) Officer Wardwell observed a total of five clues from the HGN test and had to repeat his instructions to Dr. Judson several times. (Id. ¶ 36.) Dr. Judson fails to dispute the defendants' statement that he told Officer Wardwell, prior to attempting a walk-and-turn test, that there were no physical reasons why he could not perform that test. (Id. ¶ 37; OSMF ¶ 37.) Dr. Judson also fails to dispute that Officer Wardwell demonstrated the test for him. (Id.) Finally, Dr. Judson concedes that he failed numerous aspects of the walk-and-turn test. (Id. ¶¶ 39.) Instead, he offers a

---

[1] Officer Keller corroborated Officer Wardwell's report of smelling alcohol, stating that he smelled alcohol on Dr. Judson's person when he exited the vehicle. (SMF ¶ 48.) Dr. Judson does not deny the statement of fact that is based on Officer Keller's testimony. (OSMF ¶ 48.)

[2] The defendants assert that Dr. Judson's eyes were bloodshot and that his speech was slurred, but his wife swears in her affidavit that such was not the case. (SMF ¶ 25; OSMF ¶ 25.)

qualification that he explained these failures to Officer Wardwell as arising from difficulties in mobility due to spinal surgery. (OSMF ¶ 39.) A review of Dr. Judson's affidavit indicates that he told Officer Wardwell of these physical limitations, but not that he did so before attempting to perform the walk-and-turn test, which was repeatedly explained to him and demonstrated for him.[3] (Judson Aff. ¶¶ 20-21.) This omission in the affidavit is consistent with Dr. Judson's failure to controvert the defendants' statement that he denied having a physical limitation that would prevent him from performing the test. In effect, the state of the record is that he offered a physical limitation at some later point in the encounter, as a means of explaining his poor performance, after initially indicating that he did not have any limitation that would impede his performance. After these troubles with the walk-and-turn test, Officer Wardwell asked Dr. Judson to perform a heel-to-toe test. (SMF ¶ 40.) Dr. Judson concedes that he did not perform the test as instructed. (Id.) There was an effort to have Dr. Judson perform a one-legged stand test as well, but this Dr. Judson declined to do. (Id. ¶ 41.) Officer Wardwell's affidavit represents that it was at this point that Dr. Judson indicated that he suffered from premature ventricular fibrillation and that this condition made such a test inappropriate for him. (Id. ¶ 41; Wardwell Aff. ¶ 6.) Dr. Judson's response is that he also informed Wardwell of the spinal surgery, without contesting Wardwell's statement as to the timing of these assertions. (OSMF ¶ 41.) Because of Dr. Judson's protest concerning the one-legged stand test, Officer Wardwell asked him instead to write the alphabet from the letter "d" to the letter "p." (SMF ¶¶ 42-43.) Dr. Judson took a pen from Officer Wardwell and wrote out the alphabet from "d" to "z."[4] (Id. ¶ 44.)

---

[3]    In his opposing statement, Judson asserts that he "made the officer aware of his difficulty in mobility prior to the test" (OSMF ¶ 39), but the affidavit paragraphs he relies on do not offer any indication of when he did so.

[4]    It appears that Dr. Judson began to write out the entire alphabet, writing "a" and "b" before being redirected to start with "d," although in his opposing statement he (or his counsel) admits the defendants' statement that he "failed to follow the instructions as he claims to have [initially] understood them, leaving out the letter "c" when he wrote the entire alphabet. (OSMF ¶ 46; Judson Dep. at 36-37, Doc. No. 12.)

Dr. Judson states that it is very difficult for him to distinguish consonant sounds without his hearing aid.  (OSMF ¶ 43-44.)

Officer Wardwell asked Dr. Judson to rate his sobriety, with 1 being completely sober and 10 being falling down drunk.  (Id. ¶ 49.)  Dr. Judson rated himself a 2 or 3.  (Id. ¶ 50.)

Officer Wardwell advised Dr. Judson that he was under arrest for operating a motor vehicle while under the influence of alcohol and that he would be taken to Bar Harbor Police Department for an Intoxilyzer breath test.  (Id. ¶ 51.)  Officer Wardwell placed Dr. Judson in handcuffs, double locking them so they would not tighten further, and placed him in the back of the cruiser.  (Id. ¶ 52.)  Dr. Judson offers a denial to the foregoing statement, relying on affidavits submitted by his brother, William Judson, and his brother's wife, Sarmite Judson. William Judson attests that Officer Wardwell "forced" Dr. Judson into the back of the police cruiser, without offering any salient details.  (Wm. Judson Aff. ¶ 12, Doc. No. 17-3.)  Mrs. Sarmite Judson provides a little more concerning the level of force, offering that Officer Wardwell placed Dr. Judson in the back of the cruiser "in a very rough manner."  (Sarmite Judson Aff. ¶ 13.)  Officer Keller, still standing by, has testified by deposition that he did not see any "force," other than the "minimum amount needed" to put handcuffs on and place Dr. Judson in a cruiser.  (SMF ¶ 53.)  The summary judgment statements lack any reference to even a *de minimus* injury being suffered by Dr. Judson.

The parties agree that Officer Keller attempted to explain the situation to the three passengers in Dr. Judson's vehicle but had difficulty doing so because the passengers were all talking and yelling at the same time.  (SMF ¶ 56;  OSMF ¶ 56.)  It is uncontested that all three passengers "demonstrated slurred speech" and that "the vehicle smelled of an intoxicating beverage."  (SMF ¶ 57;  OSMF ¶ 57.)  The passengers all initially refused to identify themselves

5

and also asked for the officers' names and dates of birth. (SMF ¶¶ 60-62.) Officer Wardwell called for a wrecker to transport the Judson's rental vehicle and for a taxi to transport Dr. Judson's family members, whom, Dr. Judson admits, appeared intoxicated. (SMF ¶ 54; OSMF ¶ 54.) Once the vehicle was loaded onto the wrecker and the passengers were in the taxi, Officers Wardwell and Keller left the scene to transport Dr. Judson to the Bar Harbor police station for booking and administration of the Intoxilyzer test.[5] (SMF ¶ 64.)

Upon arrival at the Bar Harbor station, Officer Wardwell escorted Dr. Judson to the Intoxilyzer room, checked his mouth for any objects or blood, found nothing, and began the 15 minute wait period to start the Intozilyzer test. (Id. ¶ 69.) Officer Wardwell read Dr. Judson the implied consent form and explained the consequences of failing to take the breath test to Dr. Judson. (Id. ¶ 70.) Officer Wardwell asked Dr. Judson if he understood the implied consent form and Dr. Judson replied that it sounded like a lot of "legalese." (Id. ¶ 71.) Before Dr. Judson would take the Intoxilyzer test, he asked to read the implied consent form for himself. (Id. ¶ 72.) The booking process at the Bar Harbor police station was recorded by surveillance camera and includes Officer Wardwell's attempts to have Dr. Judson complete a breath test on the Intoxilyzer as well as Officer Wardwell's discussion with Dr. Judson about Maine's implied consent law and the consequences of refusing to complete a breath test. (Id. ¶ 68.)

Officer Wardwell let Dr. Judson read the form and the Intoxilyzer gave out an invalid reading because no sample was introduced into the machine within the allotted period of time after it had been started. (Id. ¶ 73.) After reading the implied consent form, Dr. Judson supplied one breath sample and then refused to provide a second sample, because he said he had already taken "a test." (Id. ¶¶ 74, 77; Judson Aff. ¶ 44.) The results of the first breath sample showed a

---

[5]   Mount Desert has not acquired an Intoxilyzer machine for its police department, so its officers use the machine in Bar Harbor. (SMF ¶ 66.)

.042% blood alcohol content.  (SMF ¶ 75.)  Officer Wardwell attests that he cautioned Dr. Judson that he needed to breathe into the machine a second time because the machine requires two breath samples to comprise one valid test.  (Id. ¶ 76;  Wardwell Aff. ¶ 10.)  Dr. Judson denies this statement, but the testimony he cites in support of it does not controvert the assertion that Officer Wardwell cautioned him in this manner.  Nor does it controvert the assertion that two samples are needed for a valid test.  Rather, the affidavit testimony states only that Dr. Judson read the implied consent form to require a suspect to take "one test," and that he did not understand why Officer Wardwell was requiring him "to take a second test."  (OSMF ¶ 76; Judson Aff. ¶¶ 44, 50-51.)  In any event, the videotape of their exchange in the Intoxilyzer room reflects that Officer Wardwell did tell Dr. Judson that he needed to provide a second breath sample.  In addition to refusing to supply a second sample, Dr. Judson also refused to sign the implied consent form.  (SMF ¶ 78.)

Officer Wardwell contacted the bail commission at some point after these events transpired and the bail commissioner set bail at $540.  (Id. ¶ 81.)  Officer Wardwell issued Dr. Judson a summons for operating under the influence.  (Id. ¶ 82.)  After issuing the summons Officer Wardwell chose to transport Dr. Judson to the Hancock County Jail in Ellsworth (25 minutes away) so that he could return to his patrol duties.  Dr. Judson did not have his wallet in his possession because he had left it with his wife.  (Id. ¶ 83.)  Dr. Judson qualifies this statement by noting that Officer Wardwell had (at some point in time that is not indicated) informed Dr. Judson's family that he would be available for bail purposes at the Bar Harbor station.  (OSMF ¶ 83.)  As it turned out, the other Judsons arrived at the station only ten minutes after Officer Wardwell had left with Dr. Judson for the Hancock County Jail.  (OSMF ¶ 83.)  It is unclear how long it took for the Judsons to make their way to the Bar Harbor police station.  There is no

7

indication in the record that Officer Wardwell knew whether they would arrive anytime soon. Dr. Judson admits that the Mount Desert Police Department's policy is to transport arrestees directly to the Hancock County Jail in Ellsworth because the Mount Desert police station lacks a secure facility for processing arrestees. (SMF ¶ 67.)

In response to a statement that Officer Wardwell did not use any force beyond the minimal amount needed to apply handcuffs and place him in the cruiser, Dr. Judson contends that Officer Wardwell applied his handcuffs too tightly and that Officer Wardwell "forced him into the cruiser." (OSMF ¶ 86.) It appears from cited affidavit passages that this is in reference to the initial transport to Bar Harbor, not in reference to the transport to Ellsworth. (Dr. Judson Aff. ¶ 33, 34, 35.)[6] Dr. Judson also complains that he was a cramped for space in the back of the cruiser during both transports. (Id. ¶ 88; Dr. Judson Aff. ¶ 35.)

It is admitted that Officer Keller never applied any force to the person of Dr. Judson. (SMF ¶ 87; OSMF ¶ 87.) It is also admitted that Officer Keller was not the arresting officer. (SMF ¶¶ 92-93; OSMF ¶¶ 92-93.) The charge of operating under the influence was reduced by

---

[6] Dr. Judson's affidavit, executed on July 19, 2007, after defendants' filed their statement of facts and motion for summary judgment on June 29, 2007, includes an averment that Officer Wardwell hit him in the back of the head while putting him in the cruiser. (Dr. Judson Aff. ¶ 35.) The defendants object that this factual assertion was never made prior to the preparation of Dr. Judson's summary judgment affidavit, despite deposition questions and other discovery initiatives requesting that he describe the facts on which his excessive force claim is founded. (Defs.' Reply Mem. at 1.) From a strict, rule-based perspective, there is no need for the Court to issue an evidentiary ruling concerning the admissibility of this affidavit statement because Dr. Judson has chosen not to assert it in his Local Rule 56 statement. He provides no additional statement under Local Rule 56(c) and his opposing statement simply makes no mention of it. (See Pl.'s Opposition Mem at 2, Doc. No. 14; OSMF ¶ 86.) Dr. Judson merely mentions the hit in the back of his head in his memorandum and he cites in his opposing statement to the paragraph of his affidavit which contains, among other facts, the assertion that Wardwell "hit me in the back of the head." He does not include that salient fact in his denial while he does highlight other complaints about excessive force. Although some leniency is afforded to *pro se* litigants in certain situations, Dr. Judson is represented by counsel and Local Rule 56 requires that facts be introduced, for purposes of summary judgment, through supporting, opposing and additional *statements of material facts*. For all I know, counsel may have made a conscious decision not to include this "new" fact in his summary judgment statement because he anticipated the objection that would follow in defendant's reply. See Colantuoni v. Alfred Calcagni & Sons, 44 F.3d 1, 4-5 (1st Cir.1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."). Because Dr. Judson fails to present in his opposing statement of material facts or additional statement of material facts any assertion that he was struck by Officer Wardwell, that fact is not cognizable for purposes of the instant motion.

a district attorney to driving to endanger. (SMF ¶ 94.) Dr. Judson eventually pled *nolo* to the reduced charge. (Id. ¶ 95.)

## DISCUSSION

Dr. Judson's Section 1983 claim, although asserted in his complaint as a claim against all of the defendants, boils down to a Fourth Amendment claim against Officer Wardwell. Dr. Judson now disavows any municipal claim against the Department and Chief Willis. He also concedes that he cannot maintain his civil rights conspiracy claim. In addition, he fails to dispute the defendants' assertion that no basis for liability exists in relation to Officer Keller. It would be a wonder if he did contest that assertion. Officer Keller's "mere presence at the scene, without more, does not by some mysterious alchemy render him legally responsible under section 1983 for the actions of a fellow officer." Calvi v. Knox County, 470 F.3d 422, 428 (1st Cir. 2006). These concessions entitle all of the defendants to an entry of summary judgment on the seventh count (civil rights conspiracy) and they entitle every defendant but Officer Wardwell to summary judgment on the first count (§ 1983). What remains of the federal claims is an excessive force claim and an unlawful seizure claim against Officer Wardwell, both tethered to the first count of the complaint. Because Dr. Judson agrees that both of these theories must be analyzed under the Fourth Amendment, Dr. Judson has effectively abandoned whatever Fifth Amendment theory he had in mind when he drafted his complaint. (See Pl.'s Opposition Mem. at 3-5.) In addition to the federal claim against Officer Wardwell, Dr. Judson advances various state law claims against the defendants. Because there is diversity of citizenship between the parties, the Court should resolve the summary judgment motion with respect to the state claims as well.

**A.**     **The Summary Judgment Standard**

"The role of summary judgment is to look behind the facade of the pleadings and assay the parties' proof in order to determine whether a trial is required." <u>Plumley v. S. Container, Inc.</u>, 303 F.3d 364, 368 (1st Cir. 2002). "The device allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money, and permitting courts to husband scarce judicial resources." <u>McCarthy v. NW Airlines, Inc.</u>, 56 F.3d 313, 315 (1st Cir. 1995). A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. <u>Merch. Ins. Co.</u>, 143 F.3d at 7. If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. <u>ATC Realty, LLC v. Town of Kingston</u>, 303 F.3d 91, 94 (1st Cir. 2002).

**B.     The Fourth Amendment Theories**

Dr. Judson's federal civil rights claims arise under Section 1983 of the Civil Rights Act, which confers upon every United States citizen a right to redress against any person who, acting under color of state law, causes a deprivation of his or her "rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. The federal right

10

Dr. Judson advances at the summary judgment stage is his Fourth Amendment right to be secure in his person against unreasonable seizures, which is made applicable to the states through the Fourteenth Amendment. Two components of that right are at issue here: the right to be secure against an application of unreasonable force in conjunction with arrest and the right to have any detention of one's person comport with constitutional standards.

   1.   *Excessive force*

In Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court addressed the issue of "what constitutional standard governs a free citizen's claim that law enforcement officials used excessive force in the course of making a[] . . . 'seizure' of his person." Id. at 388. In addition to determining that such claims would be measured against the Fourth Amendment's "objective reasonableness" standard, the Supreme Court outlined the general parameters governing the use of force by law enforcement officers.

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake. Id., at 8, quoting United States v. Place, 462 U.S. 696, 703 (1983). Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. See Terry v. Ohio, 392 U.S., at 22-27. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. See Tennessee v. Garner, 471 U.S., at 8-9 (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").

Id. at 396. As the standard implies, the right to use some degree of physical coercion means that "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's

11

chambers,' violates the Fourth Amendment." Id. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). Finally, because the inquiry turns on objective factors, the "underlying intent or motivation" for an officer's conduct is not relevant. Id. at 397. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id.

The case for excessive force turns primarily on tight handcuffs applied behind the back during a brief transport from the location of the traffic stop to the Bar Harbor police station and, after a period of time without them on, for another 25 minutes during the transport to the Hancock County Jail. In addition, during these same rides, Dr. Judson withstood an uncomfortable ride in the cramped rear seat of the police cruiser. It is also undisputed that Officer Wardwell laid his hands on Dr. Judson when placing him in the cruiser so as to forcefully place him there, rather than simply guiding him, steadying him or simply permitting him to enter the vehicle of his own initiative. Unfortunately, there is precious little texture to these statements concerning force. For example, the degree of force applied by Officer Wardwell is described by Sarmite Judson in subjective terms as "very rough." Similarly, Dr. Judson informs the Court that the handcuffs were "too tight" and that the rear seat of the cruiser was "cramped." The former statement is conclusory. The latter is subjective. Neither statement is very well designed to permit a fact finder to draw an independent conclusion about the reasonableness of the force employed. Another shortcoming is the omission of any statement to the effect that Dr. Judson was compliant when told of his arrest. It is not asserted in Dr. Judson's opposing statement[7] that he was compliant when Officer Wardwell informed him he was to be arrested. It is difficult to balance an ambiguous amount of force against these ambiguities in Dr. Judson's behavior. The

---

[7] Technically, such matters should be asserted in a statement of additional material facts under Local Rule 56(c).

12

summary judgment statements do reflect that Dr. Judson underwent cervical spinal surgery in his past, that he experiences premature ventricular contractions, and that he informed Officer Wardwell of these conditions prior to being placed in the cruiser. The statements do not explain the relationship between these conditions and the particular way in which Officer Wardwell touched or manipulated Dr. Judson's person. Perhaps the point Dr. Judson is trying to make is that there is no amount of force whatsoever that could appropriately be applied to his person; that he should have received transportation without any physical contact from Officer Wardwell, which would necessarily preclude any application of handcuffs. I confess that I am not accustomed to seeing an excessive force claim brought in the context of such facts and am troubled at the idea of such a case going forward where the security of Dr. Judson's person does not seem to have been placed in jeopardy. Dr. Judson reports absolutely no injury as a consequence of the treatment he received. Although this fact is not necessarily dispositive in this federal circuit,[8] the absence of even *de minimus* physical injury is powerfully suggestive of the fact that the degree of force employed by Officer Wardwell was only enough to cause affront to Dr. Judson's dignity, not enough to support an excessive force claim.[9] Based on my review of the facts set forth in the parties' Local Rule 56 statements, I recommend that the Court grant summary judgment to Officer Wardwell on the Section 1983 claim because Dr. Judson has not demonstrated a claim calibrated to meet the demands of the excessive force standard. He quite

---

[8]   The First Circuit Court of Appeals has held that serious injury is not a prerequisite to recovery in an excessive force case and that minor injuries may suffice. Bastien v. Goddard, 279 F.3d 10, 14-15 (1st Cir. 2002); Alexis v. McDonald's Rests. of Mass., 67 F.3d 341, 353 n.11 (1st Cir. 1995).

[9]   Courts have required evidence of some physical injury in "tight handcuff" cases. See, e.g., Cortez v. McCauley, 478 F.3d 1108, 1128-1129 (10th Cir. 2007) ("In some circumstances, unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight. Although Rick Cortez complained to the officer that the handcuffs were too tight, the summary judgment record presents too little evidence of any actual injury.") (citation omitted); Lyons v. City of Xenia, 417 F.3d 565, 575-576 (6th Cir. 2005) ("In order to reach a jury on this claim, the plaintiff must allege some physical injury from the handcuffing . . . and must show that officers ignored plaintiff's complaints that the handcuffs were too tight.") (citations omitted). For examples of the kinds of presentations that have passed muster see Payne v. Pauley, 337 F.3d 767, 779-80 (7th Cir. 2003) (collecting and describing cases).

plainly has not demonstrated an application of force that rises above the "'degree of physical coercion,' typically attendant to an arrest." Pena-Borrero v. Estremeda, 365 F.3d 7, 12 (1st Cir. 2004) (quoting Graham, 490 U.S. at 396)).

Alternatively, the Court could grant the motion for summary judgment on the ground that Officer Wardwell did not violate a clearly established right and is therefore protected by the qualified immunity doctrine. After all, that is the primary argument advanced by the defendants (Mot. Summ. J. at 8) and it seems unassailable to me on this kind of record. See, e.g., Calvi v. Knox County, 470 F.3d at 425, 428 (affirming a summary judgment ruling that an officer's decision to handcuff someone behind the back for 15 minutes while a transport was made did not offend the Fourth Amendment, notwithstanding the existence of a painful hand deformity).

The Supreme Court's "decisions consistently have held that government officials are entitled to some form of immunity from suits for damages. As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "In the last analysis, . . . qualified immunity purposes to protect government functionaries who could not reasonably have predicted that their actions would abridge the rights of others, even though, at the end of the day, those officials may have engaged in rights-violating conduct." Camilo-Robles v. Zapata, 175 F.3d 41, 43 (1st Cir. 1999). In this way, the doctrine of qualified immunity protects a state actor from § 1983 liability in circumstances where the proper application of the underlying constitutional standard might be unclear and, therefore, not otherwise suited for dismissal or summary disposition. With respect to the extent of the protection conferred by the doctrine, it has been said that "the doctrine of qualified immunity leaves 'ample room for mistaken judgments' and protects 'all but the plainly incompetent or

those who knowingly violate the law.'" Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir. 1998) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1st Cir. 1986)). It cannot fairly be said that Officer Wardwell's treatment of Dr. Judson's person, in physical terms, would have been viewed by an objectively reasonable officer in his position as violative of a clearly established constitutional right.

### 2. *Excessive duration*

In his opposition memorandum, Dr. Judson argues that his unlawful seizure claim is focused on the facts and circumstances as they existed following the administration of the Intoxilyzer. (Pl.'s Opposition Mem. at 3-4.) This argument means that Dr. Judson has abandoned any argument that it was unreasonable for Officer Wardwell to have conducted a traffic stop or to have arrested Dr. Judson and taken him to the Bar Harbor police station for purposes of administering the breath test. Here is how Dr. Judson articulates this claim:

> Defendants merely rely on the existence of probable cause to take the Plaintiff into custody as satisfying their claim that the arrest was not unlawful. Plaintiff on the other hand points to a different time in the confinement. After the administration of the intoxilyzer test, which clearly shows to a reasonable person that the Plaintiff is not under the influence of alcohol, it is a partial test admissible in Court, Officer Wardwell could have released the Plaintiff. He chose not to do so. Even though he had told the Plaintiff's family members that the Plaintiff would be found at the Bar Harbor Police Station, Officer Wardwell, intended to confine him further, drove the Plaintiff unbeknownst to his family, to the Hancock County Jail a great distance away. The Plaintiff did not consent to that trip, or that confinement. He was again handcuffed behind his back for the entire trip. This confinement cannot be considered privileged. It was done spitefully to confuse the Plaintiff's family and to prevent the Plaintiff from being released promptly by a bail commissioner's assignment of bail. In fact, the Plaintiff's family did show up at the Bar Harbor Police Station and thereafter learned that the Plaintiff had been transported to Ellsworth.

(Pl.'s Opposition Mem. at 3-4.) Dr. Judson's decision to forego his unlawful arrest claim is likely based on the Law Court's low standard for drunk driving arrests. Maine law sets a very low threshold for probable cause to arrest a motorist for purposes of administering a blood alcohol

15

test. An officer need only "have probable cause to believe that the person's senses are affected to the slightest degree, or to any extent, by the alcohol that person has had to drink." State v. Webster, 2000 ME 115, ¶ 7, 754 A.2d 976, 978. It is uncontested in this case that Dr. Judson acknowledged that he had been drinking, that he smelled of alcohol (albeit not "strongly"), that he described his level of intoxication as a possible 3 on a 10-point scale (with 10 representing "falling down drunk"), that he provided an odd answer to Officer Wardwell's question as to where he was coming from, and that his performance of the field sobriety tests was spotty at best. Even though Dr. Judson disputes some of the factors relied on by Officer Wardwell, such as the assertion that his speech was slurred and that his eyes were bloodshot, what remains is sufficient to satisfy the low standard set by Maine law, though that standard is not necessarily dispositive of the federal question. Even assuming that a claim of unlawful arrest did go forward, the qualified immunity defense is insurmountable on this record.

The disputed question is whether the Fourth Amendment precluded Officer Wardwell from requiring Dr. Judson to post bail to attain release once Dr. Judson blew a 0.042 % BAC sample into the Intoxilyzer, despite Dr. Judson's refusal to supply a second breath sample to validate the test results. Maine law reflects that, although blood-alcohol testing is a central component of the state's effort to curb drunk driving, blood-alcohol test results are not dispositive of the impairment question and are not even necessary to a finding of impairment. See, e.g., State v. Mendros, 622 A.2d 1178, 1179 (Me. 1993) (holding that challenged test result was not necessary to finding of impairment); 29-A M.R.S.A. § 2521 (the implied consent law). Yet in this case, Dr. Judson is arguing that the probative value of the reading given for the solitary sample is so great that it vitiates all probable cause of impairment, even though his refusal to supply a second, validating breath sample calls the 0.042 reading into question. On the

facts of this case, I conclude that it was not unreasonable for Officer Wardwell to require Dr. Judson to post bail in order to secure his release because the initial arrest was lawful and the prematurely aborted Intoxilyzer test did not reliably undermine all of the valid evidence of impairment, however slight, that justified the arrest at its inception. Building from this foundation, I further conclude that the transport to the Hancock County Jail cannot be deemed unreasonable as that is the customary, secure location for Mount Desert police officers to bring arrestees. Officer Wardwell and Dr. Judson stopped in Bar Harbor solely because that is where the Intoxilyzer machine is located. The Constitution did not require Officer Wardwell to wait indefinitely in Bar Harbor for Dr. Judson's family to arrive to post bail. Even if this constitutional analysis is in error, these facts are incapable of demonstrating that Officer Wardwell knowingly violated a clearly establish right and, therefore, Officer Wardwell enjoys immunity on this claim as well.

**C.     State Law Claims**

In addition to the federal claims, Dr. Judson advances a claim under the Maine Civil Rights Act and several state law tort claims: negligence, false imprisonment, negligent infliction of emotional distress, intentional infliction of emotional distress, assault, "tortious interference with business and professional development," malicious prosecution, and a plea for punitive damages. (Compl. Counts II-VI, VIII-IX.) Dr. Judson fails to articulate his Maine civil rights claim except to the extent he advances the analogous federal claims discussed above. I conclude that the state civil rights claims fail for the same reason as the Section 1983 claims: the summary judgment statements do not evince any violation of Article 1, Section 5 of the Maine Constitution (prohibiting unreasonable searches and seizures) any more than they do the Fourth Amendment, see Smith v. Jackson, 463 F. Supp. 2d 72, 81 (D. Me. 2006) (citing Richards v.

Town of Eliot, 2001 ME 132, ¶ 31, 780 A.2d 281, 292 ("The analysis of the state law claims of illegal arrest and excessive force is the same as for the federal law claims")). In addition, the qualified immunity defense is equally applicable to claims brought under the Maine Civil Rights Act. Hegarty v. Somerset County, 53 F.3d 1367, 1373 n.3 (1st Cir. 1995) (citing Jenness v. Nickerson, 637 A.2d 1152, 1159 (Me. 1994)).

In opposition to the remaining state law tort claims,[10] the defendants interpose discretionary function immunity under the Maine Tort Claims Act, 14 M.R.S.A. § 8111-8118 (MTCA). (Opposition Mem. at 8-9.) The MTCA provides, in pertinent part:

> **Personal immunity for employees; procedure**
> 1. IMMUNITY. Notwithstanding any liability that may have existed at common law, employees of governmental entities shall be absolutely immune from personal civil liability for the following:
> * * * *
> C. Performing or failing to perform any discretionary function or duty, whether or not the discretion is abused; and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid[.]
> * * * *
> The absolute immunity provided by paragraph C shall be applicable whenever discretionary act is reasonably encompassed by the duties of the governmental employee in question, regardless of whether the exercise of discretion is specifically authorized by statute, charter, ordinance, order, resolution, rule or resolve and shall be available to all governmental employees, including police officers and governmental employees involved in child welfare cases, who are required to exercise judgment or discretion in performing their official duties.

14 M.R.S.A. § 8111(1)(C). "Discretionary immunity . . . applies unless the defendants' conduct 'clearly exceeded, as a matter of law, the scope of any discretion [they] could have possessed in their official capacity as [police officers].'" Carroll v. City of Portland, 1999 ME 131, ¶ 1, 736 A.2d 279, 281 (quoting Polley v. Atwell, 581 A.2d 410, 414 (Me. 1990)). Based on the summary judgment statements in this case, Officer Wardwell's various discretionary acts did not

---

[10] The excessive force claim appears to bridge the gap between a civil rights claim and a common law tort claim. See Richards, 2001 ME 132, ¶ 32, 780 A.2d at 292 (evaluating MTCA discretionary function immunity in the context of an excessive force claim against law enforcement officers).

18

clearly exceed his authority as an officer of the law. The decision to apply handcuffs behind the back for purposes of transporting an arrestee is not a clearly excessive policy or practice. Nor was it clearly excessive, as a matter of law, for Officer Wardwell to make Dr. Judson post bail, the routine practice following arrest, or to pursue the operating under the influence charge with the district attorney based on the evidence available to him.

## Conclusion

For the varied reasons set forth above, I RECOMMEND that the Court GRANT the defendants' motion for summary judgment on all claims set forth in the plaintiff's complaint.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

August 10, 2007.

/s/Margaret J. Kravchuk
U.S. Magistrate Judge